McGRATH BUILDING COMPANY, INC., a corporation, plaintiff-appellee, v. CITY OF BETTENDORF, defendant, cross-petitioner and appellant; E. J. PIERCE, JR.,d/b/a ACME CONSTRUCTION COMPANY et al., cross-defendants and appellees.

No. 49317.

(Reported in 85 N.W.2d 616)

OCTOBER 15, 1957.

McDonald & McCracken, of Davenport, and Albert J. Stafne, Jr., of Bettendorf, for appellant.

Betty, Neuman, Heninger, Van Der Kamp & McMahon, of Davenport, for plaintiff-appellee.

Lambach, Kopf, Stevenson & Christiansen, of Davenport, for cross-defendants and appellees E. J. Pierce, Jr., d/b/a Acme Construction Company and Davenport Water Company, Inc., a Delaware corporation.

Lane & Waterman, of Davenport, for cross-defendant and appellee Iowa-Illinois Gas & Electric Company, an Illinois corporation.

THOMPSON, J.—This case comes to us upon an appeal from an order before final judgment, leave to appeal having been granted. It concerns rulings of the trial court which struck from defendant's answer three affirmative defenses, and so we have before us only the pleadings of the respective parties, with the court's orders upon the plaintiff's motions to strike.

The case as made by plaintiff's petition is that on October 18, 1956, the plaintiff was the owner of two dwelling houses located on Custer Terrace, an unpaved street in the defendant city. Several months prior to the date named, the Iowa-Illinois Gas & Electric Company, the holder of a franchise for furnishing natural gas in Bettendorf, had installed a main or pipe line in the street in front of plaintiff's houses, with a service line extending into the house known as 105 Custer Terrace and connecting with a meter in the basement. On the date in question, the city, through its employees, was operating a road grader in the street in front of plaintiff's houses, for the purpose of deepening a ditch along the north side of the street and grading it. It is alleged that the gas main in the street was only five inches under ground, and was struck by defendant's grader several times, causing the service line to be disconnected from the meter. This permitted gas to escape into the basement of 105 Custer Terrace; it became ignited and an explosion resulted which entirely demolished that house and severely damaged plaintiff's adjoining house, 109 Custer Terrace. Negligence of the defendant city is alleged in various ways, and damages are asked.

We are concerned only with three defenses pleaded by the city, designated as affirmative defenses four, six and seven, each of which was upon motion of the plaintiff stricken by the trial court. It might be plausibly urged that the defendant has not been injured by these rulings and so has nothing to complain of here, since the substance of these affirmative defenses seems to have been pleaded by the defendant city in the purely defensive parts of its answer, and these are still available to it. However, the question has not been raised and the parties have argued what they consider the substantial merits of the case. We accept their views, and will determine the questions as argued. The defendant city has brought in the Iowa-Illinois Gas & Electric

Company as a defendant to cross-petition, and the utility has made here common cause with the plaintiff in upholding the rulings of the trial court, by filing a supporting brief and argument.

■ I. The plaintiff charges defendant with ten specifications of negligence. Some of these assert the failure of the defendant city to maintain its streets in a reasonably safe condition and free from nuisance; others are based, we think, upon negligence of the city's servants or agents in failing to take proper precautions to avoid the accident and injuries by having the gas turned off before grading, by failing to maintain a proper lookout, by failing to cease grading operations when its grader struck the gas line the first time, and by failing to warn the plaintiff of its impending operations. Negligence is a broad term; but in general it consists in doing something which the ordinarily prudent person would not have done, or in failing to do something which such person would have done. Many of the plaintiff's specifications come in the category of failures of the defendant's employees to do things which should have been done, and so are allegations of negligence on their part in carrying out their duties; but other specifications we think charge failure to keep the streets safe and free from nuisance. The distinction is important.

The first affirmative defense which was stricken, Number Four, alleged that the franchise granted the Iowa-Illinois Gas & Electric Company and under which it was operating created no right or duty in or upon the city to grant permits for or to supervise the installations made by the company, there have been no ordinances enacted for the same purpose, there is no duty upon the city to embody such terms in the franchise or to enact regulatory ordinances, and in the absence thereof it had no duty to regulate, supervise or inspect the mains or their manner of installation. One of the grounds of the motion to strike, which the trial court granted generally, was that the allegations are immaterial. The ruling was proper upon this ground.

■ The city's duty to keep its streets in a reasonably safe condition and free from nuisance does not depend upon any agreement permitting it to inspect installations above, upon or below their surface. It is pleaded in plaintiff's petition that the

city had knowledge or in the exercise of reasonable care should have had knowledge of the shallow location of the gas main; and the case is before us upon the pleadings.

We have recently in two cases held that cities and towns owe a duty to exercise reasonable care in keeping their public thoroughfares safe and free from nuisance. Hall v. Town of Keota, 248 Iowa 131, 79 N.W.2d 784; Florey v. City of Burlington, 247 Iowa 316, 73 N.W.2d 770. The latter case concerned a public park, but the principle set forth applies as well to streets. It is not contended here that the installation of a gas main only five inches under the surface of an ungraded street would not be dangerous and might not be found to show a failure of the city to keep the street in a reasonably safe condition, or to show a nuisance. The question is discussed at length in the two cases cited last above, and we shall not review it again.

It is true that in the Keota case we held that an iron pole which supported a traffic sign was not a nuisance upon the street, even though its maintenance in a defective condition might be negligence. But we said that uses of the streets for purposes other than their primary object of travel might be nuisances, citing Wheeler v. City of Fort Dodge, 131 Iowa 566, 108 N.W. 1057, 9 L. R. A., N.S., 146. We think the situation here is such that finding of nuisance might be made under the allegations of plaintiff's petition.

Cases which uphold the liability of a municipality upon quite similar facts are Beall v. City of Seattle, 28 Wash. 593, 603, 69 P. 12, 16, 61 L. R. A. 583, 92 Am. St. Rep. 892 ("Appellant was injured by an unseen instrument exploding within the area of the street over which the city had control. We think, when he had shown those facts, that a prima-facie case of negligence was established * * *."); Lawrence v. City of Scranton, 284 Pa. 215, 130 A. 428, 41 A. L. R. 454 (a leak in a gas main); Splinter v. City of Nampa, 70 Idaho 287, 215 P.2d 999, 17 A. L. R.2d 665 (gas escaping from a tank installed in an alley and causing damage in an adjacent building). The city may not escape liability for unsafe uses, or negligences, created in or above or under the public streets by the plea that it had permitted someone else to make installations and had no right to regulate or inspect them. Its liability, if liability it has, arises

from its failure to keep its streets reasonably safe, and free from nuisance, rather than from a failure to regulate or inspect the installations of the utility company, of which, under the pleadings, it had knowledge or reasonable means of knowledge. The trial court was correct in its ruling striking affirmative defense Number Four.

II. The defendant's sixth affirmative defense, so far as the arguments in this court are concerned, alleged the nonliability of the city for the negligent acts of its employees, agents, servants or officers while engaged in performing governmental functions. The motion to strike was sustained generally. It alleged various grounds, of which we think those asserting that the matters contained in the pleaded affirmative defense are immaterial and improper and that it fails to assert any facts entitling the city to a defense are the only important ones in view of the arguments in this court. We think the defense well pleaded and that it asserts an established principle of law; that is, that the city, although responsible for the manner in which it maintains its streets so as to keep them reasonably safe and free from nuisance, is not liable for the acts of its servants or agents in performing that duty. That is what the sixth affirmative defense pleaded by the defendant city says; that is what we said in Hall v. Town of Keota, supra, at page 140 of 248 Iowa, page 789 of 79 N.W.2d; and it is what we have said in other cases cited in the Keota case. And we have pointed out that several of the plaintiff's specifications of negligence assert failure of the employees or agents of the city to do certain things which it is alleged they should have done; in other words, they plead negligence through failure of the employees or agents to do what a reasonably prudent man would have done under the same or similar circumstances. The municipality is entitled to plead its nonliability for these acts or failures to act of its employees. The trial court was in error in striking the affirmative defense Number Six.

III. The city's affirmative defense Number Seven alleged that the city did not waive its governmental immunity by purchasing insurance to cover the liability of the city created by statute. This allegation was apparently intended to counter Paragraph 9 of the plaintiff's petition, which pleaded the pur-

chase of a policy of liability insurance by the city and the waiver of immunity thereby. The same attack was made upon this defense as upon Number Six, and the court struck it. At the outset of our consideration of this problem, it should be said that we are asked to sustain the rulings striking both affirmative defenses Numbers Six and Seven for two reasons: first, because the rule that a municipality is not liable for the acts of its agents or servants in performing purely governmental functions —that is to say that the rule of respondeat superior does not apply in such cases—is archaic, is not in accord with modern trends, and our previous holdings applying the rule should be overruled; and second, if we refuse to strike down the rule altogether, because the purchase of liability insurance should be held to be a waiver of immunity.

We can deal shortly with the plea that we abandon the rule altogether. We have asserted it in two very recent cases, Hall v. Town of Keota, supra, and Florey v. City of Burlington, also supra, and in many earlier ones. The same attack on the immunity doctrine as applied to cities and towns was made in the Florey case. But after a consideration of the reasons for the rule, of its inception and the length of time it has been applied, we said: "Our own opinion is that though the doctrine is largely of common-law origin, any substantial modification of it must come by legislation." See 247 Iowa, pages 320, 321, 73 N.W.2d, page 772. The Florey case was decided in 1955. We adhered to the immunity doctrine in Hall v. Town of Keota, supra, filed within the past year. We are not inclined to overturn the pronouncements in these cases and in many earlier ones now.

We turn then to the contention that because the defendant city purchased liability insurance it waived its immunity from the application of the doctrine of respondeat superior to the acts of its employees in performing governmental functions. We think our statute empowering cities and towns to purchase liability insurance, enacted in 1951 and now appearing as section 368A.1(12) of the Code of 1954, is of governing importance at this point, and quote it herewith:

"368A.1[12] *Liability insurance.* Have power to purchase and pay the premiums on liability and property damage insur-

ance covering and insuring municipal employees while in the performance of their duties and operating an automobile, truck, road grader, machinery or other vehicles owned or used by the municipal corporation, which insurance shall insure, cover, and protect against any liability the municipal employee or the municipal corporation may incur."

It will be noted that the insurance the municipalities are authorized to purchase is for protection against any liability the municipal employees or the municipal corporation "may incur." We find in this no expression of any legislative intent to enlarge the liability of the city or town which purchases such a policy. It is permitted only to insure against any liability it may incur; and there are, and were at the time of the enactment of the statute, many potential liabilities which both the municipality and its employees might incur. Neither the city nor its employees were protected against liability for negligence incurred in performing proprietary functions; and the city at least had liability for its failure to keep its streets and parks reasonably safe and free from nuisance. Numerous cases have so held. A legislative purpose to enlarge the potential liability of the city or town carrying insurance cannot be found in the statute. As the New Hampshire Supreme Court well said when faced with a similar contention: "An indemnity policy is for the purpose of protection against liability and not for the creation or increase of liability." Cushman v. County of Grafton, 97 N. H. 32, 35, 79 A.2d 630, 632.

A large majority of the courts which have considered the question have held that the purchase of an insurance policy does not create a waiver of immunity. Cushman v. County of Grafton, supra. Hummer v. School City of Hartford City, 124 Ind. App. 30, 112 N.E.2d 891; Wallace v. Laurel County Board of Education, 287 Ky. 454, 153 S.W.2d 915 (a case cited by appellee, but supporting appellant's position); Pohland v. City of Sheboygan, 251 Wis. 20, 27 N.W.2d 736; Thompson v. Board of Education of the City of Millville, 11 N. J. 207, 94 A.2d 206; Utz v. Board of Education of Brooke County, 126 W. Va. 823, 30 S.E.2d 342. A minority view is perhaps represented by City of Kingsport v. Lane, 35 Tenn. App. 183, 243 S.W.2d 289, and other Tennessee cases, and by Taylor v. Knox County Board of Education,

292 Ky. 767, 167 S.W.2d 700, 145 A. L. R. 1333. The latter case was decided after enactment of a statute authorizing a school district to create a fund for the payment of damages for injuries to school children, which statute was not in existence at the time of the decision in Wallace v. Laurel County Board of Education, supra. The Tennessee cases also turn upon peculiar provisions of statutes not found in our section 368A.1(12). They furnish no support for the contention that the City of Bettendorf waived its governmental immunity by purchasing a liability insurance policy. The trial court was in error in striking the city's affirmative defense Number Seven.

Costs taxed one half to plaintiff and one half to defendant.— Affirmed in part, reversed in part, and remanded.

All JUSTICES concur.